UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:17-cr-00073-JAW-1 |
| | ) | |
| DARRELL NEWTON | ) | |

**ORDER ON MOTION FOR COMPASSIONATE RELEASE**

An inmate serving a twenty-year sentence for directing a large heroin and crack cocaine distribution conspiracy moves for compassionate release to home confinement and for a modification of sentence under 18 U.S.C. § 3582(c)(1)(A). The Court concludes that although the inmate's obesity heightens his risk of complications from COVID-19 and COVID-19 is present within his prison, the seriousness of the inmate's offense, the danger he poses to the community, the need to prevent unwarranted sentencing disparities, the short amount of time he has served, and the need for general and specific deterrence preclude his release. The Court dismisses the motion without prejudice.

## I.    PROCEDURAL BACKGROUND

On October 1, 2019, the Court sentenced Darrell Newton to two-hundred and forty months of incarceration, followed by a five-year term of supervised release, no fine, and a $100.00 special assessment. *Min. Entry* (ECF No. 957). The Court imposed this sentence after Mr. Newton pleaded guilty to count one of an indictment, which charged violations of 21 U.S.C. § 841(a)(1) in connection with his conduct as the leader of a large drug conspiracy. *J.* at 1 (ECF No. 961).

On October 1, 2020, only one year after the Court sentenced him to twenty years in prison for leading the drug conspiracy, Darrell Newton filed an amended motion to reduce sentence for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). *Def.'s Suppl. to/Am. Mot. to Reduce Sentence for Compassionate Release* (ECF No. 1036) (*Def.'s Am. Mot.*).[1] On October 8, 2020, the Government responded and objected to releasing Mr. Newton. *Gov't's Obj. to Def.'s Mot. for Compassionate Release* (ECF No. 1038) (*Gov't's Opp'n*). On October 13, 2020, Mr. Newton replied. *Def.'s Reply Mem. in Supp. of Mot. to Reduce Sentence for Compassionate Release* (ECF No. 1042) (*Def.'s Reply*).

As the Court was considering Mr. Newton's motion for compassionate release, it encountered a slight wrinkle. On November 30, 2020, Mr. Newton moved pro se to hold his parallel habeas proceedings under 28 U.S.C. § 2255 in abeyance due to his impending transfer to another BOP facility but did not indicate when this transfer would occur or where the BOP intended to transfer him. *Pet'r's Mot. to Hold Proceedings in Abeyance While in Transit* at 1 (ECF No. 1050). Although Mr. Newton did not specifically request that his compassionate release motion be held in abeyance, the Court recognized that an impending transfer between BOP facilities would likely be relevant to the merits of that motion.

---

[1] Mr. Newton previously filed a pro se motion for compassionate release on September 15, 2020. *Pro Se Mot. for Compassionate Release* (ECF No. 1020). There, he requested that the Court appoint counsel to file a supplemental brief on his behalf. *Id.* On September 17, 2020 the Court granted Mr. Newton's request, appointed counsel, and ordered his counsel to notify the Court whether Mr. Newton would file an amended petition or proceed on the initial petition. *Appointment of Counsel & Scheduling Order* (ECF No. 1024). On September 23, 2020, Mr. Newton notified the Court that he intended to file an amended petition and asked for an extension of time. *Mot. to Extend Deadline to Amend Pet. for Compassionate Release or to Notify Court that Case Will Proceed on Initial Filing* (ECF No. 1029). The Court granted that motion. *Order* (ECF No. 1034).

On December 2, 2020, the Court ordered Mr. Newton to provide further details regarding the alleged transfer and further ordered the Government to provide any similar relevant information that it possessed or could obtain about Mr. Newton's purportedly impending transfer. *Order on Mot. to Stay* at 3 (ECF No. 1051). On December 3, 2020, the Government responded, indicating that a transfer was impending but that it could not reveal Mr. Newton's new designated facility for security reasons. *Gov't's Resp. to Court's Order on Mot. to Stay* at 1 (ECF No. 1053). The Government wrote it opposed a stay and requested that the Court deny Mr. Newton's motion for compassionate release without prejudice to refiling after he arrived at his new BOP facility. *Id.* at 3. On December 28, 2020 the Court dismissed Mr. Newton's motion for a stay insofar as it implicated his motion for compassionate release and elected to hold his compassionate release proceedings in abeyance pending transfer to another BOP facility, rather than impose a formal stay. *Order on Mot. to Stay* at 1-2 (ECF No. 1058). The Court further ordered the Government to provide status updates concerning Mr. Newton's transfer every twenty-eight days. *Id.* at 2.

On January 13, 2021, the Government notified the Court that Mr. Newton had been moved to FCI Butner II in North Carolina. *Gov't's Report to Court Re: Status of Def.* at 1 (ECF No. 1063). On January 19, 2021, the Court issued an order directing the parties to submit a briefing schedule to address a number of legal issues concerning the procedural and substantive implications of Mr. Newton's transfer on his motion for compassionate release. *Order on Briefing Issues* at 3 (ECF No. 1065).

3

On January 26, 2021, Mr. Newton's counsel submitted a proposed briefing schedule on behalf of both parties, stipulating that Mr. Newton had exhausted his administrative remedies pursuant to 18 U.S.C. § 3583(c)(1)(A). *Suggested Briefing Schedule Submitted by the Parties Regarding Def.'s Mot. for Compassionate Release* at 1 (ECF No. 1067). The briefing schedule further permitted Mr. Newton to submit a supplemental memorandum by February 3, 2021 and directed the Government to submit its response, if any, on or before February 10, 2021. *Id.* On January 26, 2021, the Court accepted the parties' proposed briefing schedule. *Order* (ECF No. 1068). On February 1, 2021, Mr. Newton filed his supplemental memorandum. *Def.'s Second Suppl. to Mot. to Reduce Sentence for Compassionate Release* (ECF No. 1069) (*Def.'s Suppl.*). On February 10, 2021, the Government submitted its response. *Gov't's Suppl. Obj. to Def.'s Mot. for Compassionate Release* (ECF No. 1075) (*Gov't's Suppl. Obj.*).

Finally, on March 5, 2021, the Government filed a supplemental response, attaching an exhibit from BOP Health Services, entitled "Immunizations." *Gov't's Second Suppl. Obj. to Def.'s Mot. for Compassionate Release*, Attach. 1, *BOP Health Servs. Immunizations* (ECF No. 1077) (*Gov't's Second Suppl. Obj.*) (*BOP Immunization R.*). The BOP document confirms that on February 19, 2021, Mr. Newton declined to be vaccinated with the Pfizer-BioNTech vaccine. *Id.* On March 11, 2021, Mr. Newton responded to the Government's supplementary filing. *Def.'s Suppl. Resp. in Supp. of Mot. to Reduce Sentence for Compassionate Release* (ECF No. 1078) (*Def.'s Second Suppl. Resp.*).

## II.     FACTUAL BACKGROUND

The Court now provides an abridged version of the conduct which led to Mr. Newton's conviction.[2]   The Court starts with Mr. Newton's criminal history. Prior to his federal offense, Mr. Newton had a number of convictions in the state of New York for disorderly conduct, petite larceny, driving while intoxicated, and harassment, as well as controlled substance offenses and a firearms offense.  *PSR* ¶¶ 28-37.  Some merit a brief discussion.  In 1995, when sixteen, Mr. Newton stole a 12-gauge shotgun.  *PSR* ¶ 29.  He pleaded guilty to petite larceny and was adjudicated as a youthful offender.  *Id.*  He violated his probation for this offense, failed to perform the required forty hours of community service, and did not complete the required drug and alcohol abuse evaluation.  *Id.*  He also effectively refused to cooperate with New York state probation and future supervision was deemed futile.  *Id.*

In 1998, Mr. Newton pleaded guilty to criminal possession of a weapon in the second degree.  *PSR* ¶ 34.  This plea followed a December 29, 1997 incident in which Mr. Newton was involved in a shootout at an apartment complex in Elmira, New York.  *Id.*  One bullet passed through the interior bedroom of a nine-year-old boy and two bullets glanced off the siding of a window to another child's bedroom.  *Id.*  Police identified Mr. Newton as involved with the shooting after locating him nearby while he was fleeing on foot from a stolen vehicle.  *Id.*  Mr. Newton admitted driving the

---

[2]     The Court draws much of this factual background from Mr. Newton's 2nd Revised Presentence Investigation Report (PSR).  *See Restricted U.S. Probation Filing*, Attach. 3, *PSR* (ECF No. 1023).  The Court adopted the PSR in full and relied on it to sentence Mr. Newton.  *Statement of Reasons* at 1 (ECF No. 962).  At the sentencing hearing on October 1, 2019, Mr. Newton admitted that the contents of the PRS were true and accurate.  *Tr. of Proceedings*, *Sentencing Proceedings* at 5:18-6:18 (ECF No. 994) (*Sentencing Tr.*).

stolen vehicle and owning cocaine and cocaine base found next to the vehicle. *Id.* He led officers to an area nearby the apartment complex where they recovered a semi-automatic pistol he had purchased to shoot someone with whom he had quarreled earlier in the week. *Id.* He further claimed that he had visited the apartment complex to pick up marijuana but started shooting after individuals rushed him. *Id.* He was sentenced to serve an indefinite term of incarceration between five and ten years, subject to parole. *Id.* As such, after Mr. Newton was first paroled in 2005, he served portions of this sentence in installments, concurrently with sentences for new offenses and parole violations. *Id.*

On October 30, 2006, Mr. Newton received a six-year concurrent sentence in New York state for several drug-related offenses. *PSR* ¶ 35. On June 16, 2006, law enforcement spotted Mr. Newton departing from a suspected drug-involved apartment. *Id.* Law enforcement riding in a marked vehicle attempted to stop Mr. Newton after he failed to stop at a stop sign. *Id.* A high-speed chase followed, during which Mr. Newton swerved towards police vehicles trying to stop him. *Id.* He eventually stopped his car and fled on foot, but police apprehended him. *Id.* Police found 169 plastic bags of cocaine on his person. *Id.* Mr. Newton did all of this about ten months after he was paroled for his 1997 firearms offense. *Id.* ¶¶ 34-35.

Turning to Mr. Newton's federal offense, beginning in approximately 2015, a drug trafficking organization (DTO) based in the Rochester, New York area conspired to possess with intent to distribute heroin, fentanyl, and crack cocaine throughout central Maine. *PSR* ¶ 5. Each week, members of the DTO would travel to New York

and Massachusetts to pick up large quantities of heroin and crack cocaine. *Id.* After picking up the drugs, the conspirators would transport them to Maine for distribution through a network of "stash" and "trap" houses.[3] *Id.* At the height of the conspiracy, there were between twelve and fifteen trap houses throughout central Maine, where out-of-state members of the DTO would deal drugs to Mainers. *Id.* The DTO also used local dealers to distribute some narcotics. *Id.* U.S. Probation Office (PO) conservatively estimated that the conspiracy earned $1,350,000.00 in gross drug proceeds during Mr. Newton's ninety-week involvement. *PSR* ¶ 8.

Mr. Newton led the DTO. *Id.* ¶ 6. Although he primarily stayed in Rochester, he oversaw the Maine operation, controlled the drug supply, and received the proceeds. *Id.* During weekly re-supply trips from Maine to New York and Massachusetts, co-conspirators brought Mr. Newton between $15,000 and $20,000 of drug proceeds. *Id.* ¶ 8. Conservatively, the PO estimates that Mr. Newton is responsible for 15,427.12 kilograms of converted drug weight. *Id.* ¶ 10. He also generally organized the operation and recruited many of his co-conspirators. *Id.* ¶ 6. Some of Mr. Newton's co-conspirators committed gun crimes in Maine, including two murders, but evidence directly linking Mr. Newton to those murders is inconclusive. *Id.* ¶ 9.

Based on his criminal history and offense conduct, the Court determined Mr. Newton was a Criminal History Category IV and had a Total Offense Level of 39. *Statement of Reasons* at 1. The applicable sentencing guideline range was three

---

[3]     A "stash" house is where the DTO stored the drugs; a "trap" house is where it sold them. *PSR* ¶ 5; *Sentencing Tr.* at 46:1-7.

hundred sixty months to life imprisonment, five years of supervised release, and a fine between $50,000.00 and $1,000,000.00. *Id.* Because of Mr. Newton's exposure to acts of violence during his formative years, the Court varied downward, and sentenced him to two-hundred and forty months of incarceration, five years of supervised release, no fine, and a $100.00 special assessment. *Id.* at 3; *J.* at 2-7.

## III.   THE PARTIES' POSITIONS

### A.   Darrell Newton's Amended Motion

Mr. Newton contends that his medical conditions, when combined with the risks posed by the COVID-19 pandemic, present an extraordinary and compelling reason warranting compassionate release under 18 U.S.C. § 3582(c)(1)(A). *Def.'s Am. Mot.* at 1-2. He submitted medical records that show he is obese, with a body mass index of 32.6 as of mid-April 2020. *Id.*, Attach. 1, *Darrell Newton Medical Records* at 3 (*Newton Med. R.*). A blood test from August 31, 2020 revealed that he has increased Hemoglobin A1C levels, which indicates he is at increased risk of diabetes. *Id.* at 6-7. Mr. Newton further asserts that some of his blood pressure readings have been elevated but he acknowledges that no medical professional has ever diagnosed him with high blood pressure. *Def.'s Am. Mot.* at 2 (citing *Newton Med. R.* at 8-9). He has experienced several eczema flare-ups while in prison. *Newton Med. R.* at 9.

Mr. Newton contends that although he "was convicted of a serious offense," he has completed educational and counseling courses while incarcerated and that "further participation in work and substance abuse programs" during supervised release "would reduce [his] risk of danger to the community." *Def.'s Am. Mot.* at 3.

8

He also argues that his motion is timely because "[m]ore than 30 days have elapsed since the warden of Schuylkill FCI received [his] request" for compassionate release. *Id.*

### B.      The Government's Opposition

The Government concedes that Mr. Newton's obesity presents an extraordinary and compelling reason warranting his early release. *Gov't's Opp'n* at 1. However, the Government contends that the danger Mr. Newton poses to the community and the § 3553(a) factors tip the balance against releasing him. *Id.*

In arguing that releasing Mr. Newton is inadvisable, the Government focuses on his dangerousness and the section 3553(a) factors. *Id.* at 10. Specifically, the Government relies upon the seriousness of Mr. Newton's federal offense, that he is only forty-one years old, and has a lengthy criminal history, which began at age sixteen. *Id.* at 10-11. The Government contends that Mr. Newton would "pose[] a danger to the community if released after serving only 17% of his twenty year sentence . . .." *Id.* at 13.

Shifting to deterrence, the Government notes Mr. Newton "has served far less in federal prison, than he has served for his prior offenses in the New York State correctional system.  It is apparent that those longer sentences did not deter him. There is no reason to believe that his comparatively brief stay in federal prison will." *Id.* at 13.  On general deterrence, the Government avers that releasing Mr. Newton "after serving approximately 17% of his sentence in an essentially COVID free prison, based on a concern that [he] might get ill <u>if</u> he contracts COVID . . . unintentionally

sends the message to [Mr. Newton] (and others) that . . . the offense is not that serious and that he has been punished enough." *Id.* In addition, the Government asks the Court to consider potential sentencing disparities among Mr. Newton and his co-conspirators that could result from an early release. *Id.*

### C.   Darrell Newton's Reply

Mr. Newton's one-page reply cites *United States v. Hardy*, Crim. No. ELH-11-358, 2020 U.S. Dist. LEXIS 137564, at *5 (D. Md. Aug. 3, 2020) for the proposition that the Court can grant compassionate release even when a prisoner's facility had a low number of active COVID-19 cases. *Def.'s Reply* at 1.

### D.   Darrell Newton's Supplemental Memorandum

In his supplemental memorandum, Mr. Newton notes that although he was transferred to FCI Butner to address his eczema, which was resistant to treatment during his time at FCI Schuylkill, "nothing has changed in his condition that would affect the analysis of his motion for compassionate release." *Def.'s Suppl. Mem.* at 2. Turning to the risk of contracting COVID-19 at FCI Butner, Mr. Newton urges "that there is a very real risk of exposure to Covid-19 for [him] at the Butner facility" and highlights an attached memorandum dated December 30, 2020 from the warden at FCI Butner II, which explains the prison's "Stay in Shelter" lockdown restrictions. *Id.* at 2; *id.*, Attach 1, *Mem. for FCI II Inmate Population* (*Butner Mem.*).

The warden's memorandum indicates that due to "numerous inmates" reporting symptoms and later testing positive for COVID-19, FCI Butner II will impose a lockdown "to cease the spread of the COVID-19 virus." *Butner Mem.* at 1.

Inmates "will continue to be given access to medical care, showers, and phone and email access in small groups at designated times, on a limited basis . . ." and the prison "will be resuming delivery of meals and commissary distribution to the housing units." *Id.* "All movement outside of [an inmate's] assigned cell will still require a face mask to be worn . . ." and the BOP has asked inmates to "continue to increase [their] sanitation and hygiene efforts . . .." *Id.*

### E.    The Government's Supplemental Objection

Regarding exhaustion, "[i]t is the Government's position that the Court may conclude that [Mr. Newton] has satisfied the claim processing rule for this motion, even though he has been moved to a new facility." *Gov't's Suppl. Obj.* at 1 n.1.  On the merits, the Government first notes that "[a]s of February 9, 20[21], Butner reports 90 inmates and 9 staff are testing positive for COVID-19.  In addition, 575 staff and 485 inmates have received COVID-19 vaccinations." *Id.* at 2 (internal citation omitted).  Citing Mr. Newton's medical records, the Government further notes that Mr. Newton "has tested negative for COVID-19 on five separate occasions . . ." and "does not report any COVID-19 symptoms." *Id.* at 1 (citing *id.*, Attach 1, *Bureau of Prisons Health Servs. Clinical Encounter* at 7-8).  Finally, the Government concludes that "[f]or the reasons discussed in its original objection, and for the reasons cited above, the Court should deny [Mr. Newton's] motion.  [Mr. Newton] poses a danger to the public and the 3553(a) factors do not weigh in favor of his release." *Id.*

### F.   The Government's Second Supplemental Objection

On March 5, 2021, the Government filed a document from BOP Health Services, entitled "Immunizations," which confirmed that on February 19, 2021, Mr. Newton declined the Pfizer-BioNTech vaccine.  *BOP Immunization R.* at 1.  In its memorandum, the Government argues that Mr. Newton's refusal should be "relevant to the Court's analysis of the defendant's motion."  *Gov't's Second Suppl. Obj.* at 1. The Government points out that Mr. Newton "argues that he should be granted release because he fears contracting the virus, yet when offered a vaccine that is highly effective in preventing a person from contracting the virus, he refuses."  *Id.* The Government says that this "ought to cause the Court to question the defendant's true purpose in filing his motion."  *Id.*

### G.  Darrell Newton's Supplemental Response

On March 11, 2021, Mr. Newton briefly responded.  *Def.'s Second Suppl. Resp.* at 1.  He acknowledged that he had declined the vaccine as indicated in the BOP record; however, he said that he did so, because he is concerned about the side effects of the vaccine.  *Id.*  Mr. Newton further stated that he has been watching the inmates who were vaccinated and observing their condition, and that "he will likely be vaccinated in the coming weeks based upon his understanding that the inmates he has followed have experienced few side effects."  *Id.*

## IV.  LEGAL STANDARD

Over the course of the COVID-19 pandemic, the Court has addressed the legal standard for deciding a motion for compassionate release on several occasions.  *See,*

*e.g., United States v. Crosby*, 1:17-cr-00123-JAW-01, 2020 U.S. Dist. LEXIS 199085, at *16-23 (D. Me. Oct. 27, 2020).  Put succinctly, 18 U.S.C. § 3582(c)(1)(A)(i) permits a court to modify a term of imprisonment when (1) "extraordinary and compelling reasons warrant" the movant's release, (2) release is consistent with "the factors set forth in [18 U.S.C. §] 3553(a)," and (3) release comports with "applicable policy statements issued by the Sentencing Commission . . . ."  18 U.S.C. § 3582(c)(1)(A).[4]

The United States Sentencing Commission issued a policy statement under United States Sentencing Guideline § 1B1.13 for addressing compassionate release motions under § 3582(c)(1)(A).[5]  This policy statement requires that the movant must meet the "requirements of subdivision (2)," which provides that a court shall determine that "the defendant is not a danger to the safety of any other person or to

---

[4]       Section 1B1.13 of the United States Sentencing Commission Guidelines addresses reductions in the terms of imprisonment under 18 U.S.C. § 3582(c)(1)(A).  However, the Commission promulgated these provisions before Congress enacted the First Step Act.  *See United States v. Brooker*, 976 F.3d 228, 230-34 (2d Cir. 2020) (discussing the history of § 1B1.13 and the First Step Act).  As Judge Hornby of this District noted, the "Second, Fourth, Sixth and Seventh Circuits have . . . ruled that the Guideline policy statement applies only to motions brought by the Director of the Bureau of Prisons, not to motions for relief brought by defendants, and nothing limits judges' discretion in considering 'the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release."  *United States v. Almeida*, Nos. 2:17-cr-52-DBH-01, 2:11-cr-127-DBH-01, 2021 U.S. Dist. LEXIS 364, at *4 (D. Me. Jan. 4, 2021) (quoting *Brooker*, 976 F.3d at 235-37 and citing *United States v. McCoy*, 981 F.3d 271, 281-83 (4th Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1108-11 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020)); *see United States v. Gowdy*, No. 20-60800 Summary Calendar, 2020 U.S. App. LEXIS 40409, at *3 (5th Cir. Dec. 28, 2020) (describing whether § 1B1.13 applies to motions for compassionate release as an "open question"); *United States v. Pelloquin*, No. 20-12818-DD, 2020 U.S. App. LEXIS 39966, at *4 (11th Cir. Dec. 21, 2020) ("not frivolous").

[5]       As the Court has previously discussed, "[t]he Sentencing Commission promulgated this policy statement before the emergence of the COVID-19 pandemic and before the changes to § 3582 put in place by the FIRST STEP Act; its provisions are therefore not directly related to the unique circumstances presented by a global pandemic.  Nevertheless, the Court finds the policy provisions are a useful starting point for its analysis of the compassionate release motion."  *Crosby*, 2020 U.S. Dist. LEXIS 199085, at *20 n.1.  Similarly, Judge Hornby of this district has ruled that this policy statement "'provides helpful guidance' but is 'not ultimately conclusive given the statutory change.'"  *See United States v. Rembert*, No. 2:12-CR-66-DBH, 2020 U.S. Dist. LEXIS 210841, at *1 (D. Me. Nov. 11, 2020) (quoting *United States v. Fox*, No. 2:14-cr-03-DBH, 2019 U.S. Dist. LEXIS 115388, at *4 (D. Me. July 11, 2019), *aff'd*, No. 19-1785 (1st Cir. July 23, 2020)).  The Court agrees.

the community, as provided in 18 U.S.C. § 3142(g)."  U.S. SENTENCING GUIDELINES MANUAL § 1B1.13 cmt. n.1 (U.S. SENTENCING COMM'N 2018) (U.S.S.G.).   Section 3142(g) sets forth four factors that a court must consider before releasing a person pending trial.   They include: (1) the nature and circumstances of the offense, specifically whether the crime is a crime of violence or involves a controlled substance; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.  18 U.S.C. § 3142(g).

The policy statement also provides criteria for determining whether "extraordinary and compelling reasons" exist to release the defendant.   U.S.S.G. § 1B1.13 cmt. n.1.  These reasons include certain enumerated terminal illnesses and similar conditions, physical, functional, mental, or cognitive impairments, age, family circumstances, and other unenumerated reasons.   *Id.* § 1B1.13 cmt. n.1 (A-D).  The policy statement further provides that "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment."  *Id.* § 1B1.13 cmt. n.2.  Finally, it states that "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement."  *Id.* cmt. n.3.

The movant bears the burden of proving that he is entitled to a sentence reduction, and "the Court has broad discretion to grant or deny a motion for sentence reduction."  *United States v. Curtis*, No. 1:14-cr-00140-JAW, 2020 U.S. Dist. LEXIS 102045, at *12 (D. Me. June 11, 2020) (quoting *United States v. Britton*, No. 18-cr-

108-LM, 2020 U.S. Dist. LEXIS 83396, at *4 (D.N.H. May 12, 2020) (internal citations omitted)).

## V.   DISCUSSION

The Court concludes that Mr. Newton's obesity, when combined with the risks posed by the COVID-19 pandemic, weighs in favor of Mr. Newton's release. However, those risks are undercut by Mr. Newton's relatively young age and lack of underlying diagnosed medical conditions that place him at risk other than obesity. As such, Mr. Newton has not met his burden to prove extraordinary and compelling reasons warrant his release. Other considerations make it similarly improper to release Mr. Newton. Here, the need to protect the public is paramount. Additionally, the short duration of prison time he has served in relation to his twenty-year sentence, the low number of known COVID-19 cases in his prison, specific and general deterrence, and the need to prevent sentence disparities between Mr. Newton and his co-conspirators also weigh against release.

### A.   Exhaustion

18 U.S.C. § 3582(c)(1)(A) contains a mandatory claim processing rule, which bars some compassionate release motions as untimely. *See Crosby*, 2020 U.S. Dist. LEXIS 199085, at *17 (citing *United States v. Lugo*, No. 2:19-cr-00056-JAW, 2020 U.S. Dist. LEXIS 63673, 2020 WL 1821010, at *3 (D. Me. Apr. 10, 2020)). However, that provision is not a jurisdictional bar and the Government can waive the exhaustion requirement, either expressly or by failing to raise it as a defense. *See id.* (citing *United States v. Alam*, 960 F.3d 831, 833 (6th Cir. 2020)).

As the Court indicated in its order dated January 19, 2021, "[t]he BOP transfer of Mr. Newton from FCI Schuylkill to FCI Butner II raises the question of whether in order to maintain his motion for compassionate release, Mr. Newton must make a new request for compassionate release, this time to the warden of FCI Butner II, or whether his earlier request to the warden at FCI Schuylkill fulfills the exhaustion of administrative remedies requirement." *Order on Briefing Issues* at 2. Here, however, the Government conceded Mr. Newton's initial request to the BOP at FCI Schuylkill satisfies the statutory exhaustion requirement. *Gov't's Suppl. Obj.* at 1 n.1. In light of the Government's concession, the Court concludes the Government has waived the exhaustion defense and decides Mr. Newton's compassionate release motion on its merits.[6]

## B.   Extraordinary and Compelling Reasons

To grant Mr. Newton's motion under 18 U.S.C. § 3582(c)(1)(A)(i), the Court must find "extraordinary and compelling reasons warrant[ing]" a reduction in sentence. According to the Centers for Disease Control and Prevention (CDC), there are several factors that increase a person's risk of severe illness from COVID-19. Arguably, the most decisive factor is a person's age. *Older Adults*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited Mar. 15, 2021). Generally, the risk of severe complications from COVID-19 increases as a person ages, and more than eighty percent of all deaths occur in people age sixty-five or older. *Id.* However, people younger than sixty-five

---

[6]   In so ruling, the Court has not reached the merits of whether an inmate must renew compliance with the exhaustion requirement following a transfer between BOP facilities.

may still face high risk of complications. *Id.* Fortunately, at age forty-two, Mr. Newton does not fit within the age-related high-risk category.

People with certain medical conditions are also at high risk. *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Mar. 15, 2021) (*CDC COVID Med. Conditions*). Mr. Newton provided medical records which show that he is obese, with a body mass index (BMI) of 32.6 as of mid-April 2020. *Newton Med. R.* at 3. According to the CDC, obesity is one of several conditions that place a person at an increased risk of serious complications from COVID-19. *CDC COVID Med. Conditions.* The CDC defines obesity as a BMI of between 30 and <40 kg/m² and severe obesity a BMI of 40 kg/m². *Id.* In terms of risk of severe illness from COVID-19, the CDC does not differentiate between obesity and severe obesity. *Id.* However, at 32.6 BMI, Mr. Newton is at the lower edge of the obesity scale.[7]

The CDC does not consider Mr. Newton's other conditions such as potential prediabetes, yet-to-be-diagnosed high blood pressure, and eczema to greatly increase a person's risk. Nevertheless, due to his obesity, the CDC guidance establishes that Mr. Newton is at an increased risk of serious complications if he were to contract COVID-19.

---

[7]       The medical records reflect that while in federal prison, Mr. Newton has achieved an impressive weight loss. Upon entering FCI Schuylkill in the fall of 2019, Mr. Newton weighed between 260 and 265 pounds and more recently, he has weighed as low as 234 pounds. *Newton Med. R.* at 1, 5. A thirty-pound weight loss is encouraging and commendable. If he were to be able to lose roughly an additional twenty pounds, he would place himself out of the obese category that puts him at higher risk of severe illness. At the same time, the Court accepts his assertion that his current BMI places him at increased risk for severe illness if he were to contract COVID-19.

Another relevant factor to consider is the risk that Mr. Newton will contract COVID-19 while incarcerated at FCI Butner II.  Located in Butner, North Carolina, FCI Butner II is a medium security federal correctional facility, which houses 1,415 male offenders.  *FCI Butner Medium II*, BOP, https://www.bop.gov/locations/institutions/btf/ (last visited Mar. 15, 2021).  Fifteen inmates and three BOP staff members at FCI Butner II are currently positive for COVID-19.  *COVID-19 Coronavirus*, BOP, https://www.bop.gov/coronavirus/ (last visited Mar. 15, 2021) (*BOP Coronavirus*).  Since the pandemic began, three inmates at FCI Butner II have died from COVID-19.  *Id.*  Another four hundred twenty-four inmates and twenty staff have tested positive for the virus but recovered.  *Id.*

The BOP has recently begun to publish statistics about its immunization program.  The BOP website, however, addresses the Butner Federal Correctional Complex (FCC) and does not differentiate among the four Butner facilities: FCI Butner Low, FCI Butner Medium, FCI Butner Medium II, and FMC Butner, so the Court is uncertain how these statistics apply to Mr. Newton's facility.  Nevertheless, the most recent statistics for Butner FCC reveal that the BOP has fully inoculated 812 staff members and 1,384 inmates.  *BOP Coronavirus.*

The letter Mr. Newton submitted outlining the BOP's response to the spread of COVID-19 in FCI Butner II suggests that the BOP is doing its level best to reduce the risk that inmates will contract the virus.  However, the data speak for themselves.  Although the threat posed by the virus may be abating nationwide, it lingers within the walls of FCI Butner II.  This fact combined with the fact that the prison

18

environment is a difficult place for Mr. Newton to socially distance and take other precautions, weigh in favor of release.

Nevertheless, the Court concludes that Mr. Newton's circumstances fall short of presenting extraordinary and compelling reasons for his release. Even though Mr. Newton's obesity somewhat heightens his risk of complications from COVID-19 and COVID-19 is present within FCI Butner II, the Court finds that other facts weigh against a finding of extraordinary and compelling reasons for compassionate release. Mr. Newton is forty-two and has no CDC-identified risk factors other than obesity. On balance, Mr. Newton's youth and fair health make it such that his risk of serious complications from COVID-19 is neither extraordinary nor compelling. The Court's conclusion on this aspect of the compassionate release inquiry precludes Mr. Newton's release.

The Court acknowledges, as Mr. Newton acknowledges, that he declined a Pfizer-BioNTech vaccine on February 19, 2021, apparently due to his concerns about side effects. In his response, he represented that he was watching other inmates who received the vaccine and was likely to undergo the vaccine within a couple of weeks because those inmates had not experienced adverse side effects from the vaccine. In general, the Court agrees with the Government that Mr. Newton's position regarding his fear of contracting COVID-19 and his unwillingness to undergo a vaccine to minimize the effects of the virus is contradictory. This is particularly true as Mr. Newton stated it is likely he will undergo the vaccine within a couple of weeks, without any convincing explanation for the delay. The Court does not, however, rest

19

its dismissal of his motion for compassionate release on his declination of the vaccine, because his motion is plainly otherwise non-meritorious for the reasons set forth in this order.

## C.    Danger to the Community

The Court also concludes Mr. Newton remains a danger to the community, which similarly precludes his release. The Court rests this finding primarily on two considerations. First, Mr. Newton's offense of conviction. At sentencing the Court remarked that "[t]he scale of the Newton drug trafficking organization was truly staggering." *Sentencing Tr.* at 46:17-18. His conduct speaks for itself. Mr. Newton was the chief architect of an enormous and sophisticated interstate fentanyl, heroin, and crack cocaine distribution conspiracy that, conservatively estimated, yielded over $1.3 million in gross revenue. The PO conservatively estimated he was responsible for 15,427.12 kilograms of converted drug weight. *PSR* ¶ 10. That conspiracy caused untold damage to the people of central Maine and Mr. Newton profited from their suffering. Members of the conspiracy also illegally bought fifteen to sixteen firearms with cash or drugs from Maine residents. *PSR* ¶ 9.

Second, Mr. Newton's lengthy criminal history and age further informs the Court's dangerousness finding. Mr. Newton is in his early forties, with a criminal record spanning into his late teenaged years. The Court previously said that "[t]he need to protect the public [from Mr. Newton] is obvious." *Sentencing Tr.* at 49:15. Before Mr. Newton began the conduct underlying this federal conviction, he had already served prison time for the 1997 firearms conviction. *PSR* ¶ 34. More recently,

he served a six-year prison sentence in New York, which concluded in November 2014. *Sentencing Tr.* at 49:15-19. By January of 2015, a mere two months after his release from state prison, Mr. Newton was overseeing a drug smuggling operation in Maine. *Id.* This fact is all the more troubling when one considers that Maine is more than five hundred miles away from Mr. Newton's home in the Rochester, New York area. *Id.* To account for this geographic reach, the Court reasoned that the contacts Mr. Newton developed during his prior stints in prison made it possible for him to organize this conspiracy and obtain a significant amount of heroin and crack cocaine in just two months. *Id.* at 49:19-50:4. As such, the Court sees a palpable need for specific deterrence. Mr. Newton's criminal history and previous shorter prison terms did not deter his continuing criminal conduct.

Relatedly, Mr. Newton offered no argument that he has rehabilitated himself, although he did inform the Court that took several educational courses while incarcerated at the Somerset County Jail. *Def.'s Am. Mot.* at 3. He provided no plan for his living arrangements if the Court released him. Based on his criminal record and his leadership of the drug trafficking organization that led to his conviction, Mr. Newton will have a difficult burden convincing the Court that he should be released early; however, for the conversation even to start, Mr. Newton must attempt to make a more substantial showing of rehabilitation and present a well-crafted plan for his release. Just a short time ago, Mr. Newton stood at the head of his own self-created multi-state drug trafficking organization and he had demonstrated he is capable of organizing and sustaining large-scale criminal activity. Moreover, just as he did

almost immediately after his last release from incarceration, the Court is concerned that an early release would afford him an opportunity to once again endanger the public safety.

To sum up, the Court concludes that continued incapacitation of Mr. Newton, pursuant to the terms of his lawfully imposed sentence, best serves the public interest. At this time, Mr. Newton has afforded the Court no grounds on which the Court may conclude that releasing him would not jeopardize the public safety. Thus, Mr. Newton is a danger to the community and releasing him would contravene 18 U.S.C. § 3142(g).

### D.    The Section 3553(a) Factors

The Court applied the 18 U.S.C. § 3553(a) factors when it sentenced Mr. Newton a little over one year ago. *Sentencing Tr.* at 40:13-22. The Court has reviewed its prior determination and reaffirms in full. The Court received no new information that would alter its reasoning. The Court briefly addresses two related considerations here and concludes both weigh against releasing Mr. Newton.

First, the Court has considered the need to prevent unwarranted sentencing disparities. Mr. Newton had fifteen codefendants; none as culpable as he was. *Sentencing Tr.* at 48:16-49:14. On November 19, 2020, the Court dismissed a compassionate release motion brought by codefendant Nicole Truman in part because of the severity of her crimes in relation to the short amount of time that she had served. *See United States v. Truman*, No. 1:17-cr-00073-JAW-4, 2020 U.S. Dist. LEXIS 216934, at *37 (D. Me. Nov. 19, 2020) (finding that "serv[ing] around fifty

percent of an already reduced sentence" is "too short a period of incarceration to effect general deterrence"). Ms. Truman was less culpable than Mr. Newton. *See id.* at *33-34 (describing Ms. Truman's role as an intermediate-level participant in the conspiracy). He led the conspiracy while she was an average participant. Given their respective levels of culpability, the Court cannot justify releasing Mr. Newton while Ms. Truman remains in prison.

In addition to Ms. Truman, numerous other co-defendants remain in federal or state prison serving their sentences for their respective roles in Mr. Newton's drug trafficking conspiracy. *See United States v. Worrell*, No. 1:17-cr-00073-JAW (serving 120-month sentence); *United States v. Betances*, No. 1:17-cr-00073-JAW (serving 126-month sentence); *United States v. DeJesus*, No. 1:17-cr-00073-JAW (serving 130-month sentence); *United States v. Davis*, No. 1:17-cr-00073-JAW (serving 54-month sentence); *United States v. Folkner*, No. 1:17-cr-00073-JAW (serving 72-month sentence); *United States v. Hercules*, No. 1:17-cr-00073-JAW (serving 87-month sentence). To release Mr. Newton when others less culpable remain in prison would be inconsistent with the statutory directive to avoid unwarranted sentencing disparities among co-defendants.

General deterrence is another relevant consideration. Mr. Newton attached a document to his amended motion, which shows that as of September 17, 2020 he is only three years and roughly three and one-half months into his twenty-year sentence. *Am. Mot.*, Attach. 2, *Darrell Newton Compassionate Release Request Inmate Data.* General deterrence is often difficult to quantify. Here, it is self-evident.

Releasing Mr. Newton after he has served less than twenty percent of his twenty-year sentence would give some drug traffickers the impression that similar conduct is not worthy of serious punishment. The Court already showed Mr. Newton considerable leniency when it sentenced him to ten years below the applicable guideline range. Just punishment, specific and general deterrence, and the need to promote respect for the law lead the Court to conclude that no further reduction is warranted.

## VI.   CONCLUSION

The Court DISMISSES Darrell Newton's Supplement to/Amended Motion to Reduce Sentence for Compassionate Release (ECF No. 1036) without prejudice.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 15th day of March, 2021.