UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:17-cr-00073-JAW-1 |
| | ) | |
| DARRELL NEWTON | ) | |

**ORDER ON MOTION FOR REDUCTION OF SENTENCE**

An inmate serving a twenty-year sentence for directing a large heroin and crack cocaine distribution conspiracy again moves for compassionate release, seeking a reduction of sentence under 18 U.S.C. § 3582(c)(1)(A). The seriousness of the inmate's offense, his criminal history, the need for general and specific deterrence, and his sentence being considerably below the sentencing guideline range all counsel against his release. The Court concludes that although the inmate has experienced challenging prison conditions and taken several nonmandatory educational courses, he presents no extraordinary or compelling reasons for reduction of his sentence. Therefore, the Court dismisses the motion without prejudice.

**I.    PROCEDURAL BACKGROUND**

On October 1, 2019, the Court sentenced Darrell Newton to two-hundred-and-forty months of incarceration, followed by a five-year term of supervised release, no fine, and a $100.00 special assessment. *Min. Entry* (ECF No. 957). The Court imposed this sentence after Mr. Newton pleaded guilty to count one of an

indictment that charged a violation of 21 U.S.C. § 841(a)(1) in connection with his conduct as the leader of a large drug conspiracy. *J.* at 1 (ECF No. 961).

On October 1, 2020, only one year after the Court sentenced him to twenty years in prison, Darrell Newton filed an amended motion to reduce sentence for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). *Def.'s Suppl. to/Am. Mot. to Reduce Sentence for Compassionate Release* (ECF No. 1036) (*Def.'s Am. Mot.*).[1] On October 8, 2020, the Government responded and objected to releasing Mr. Newton. *Gov't's Obj. to Def.'s Mot. for Compassionate Release* (ECF No. 1038). On October 13, 2020, Mr. Newton replied. *Def.'s Reply Mem. in Supp. of Mot. to Reduce Sentence for Compassionate Release* (ECF No. 1042).

After a procedural wrinkle caused by Mr. Newton being transferred to a different facility and supplemental filings by the parties, on March 15, 2021, the Court dismissed without prejudice Mr. Newton's motion for compassionate release and modification of sentence. *See Pet'r's Mot. to Hold Proceedings in Abeyance While in Transit* (ECF No. 1050); *Order on Mot. to Stay* (ECF No. 1051); *Gov't's Resp. to Court's Order on Mot. to Stay* (ECF No. 1053); *Order on Mot. to Stay* (ECF No. 1058); *Def.'s Second Suppl. to Mot. to Reduce Sentence for Compassionate Release* (ECF No. 1069); *Gov't's Suppl. Obj. to Def.'s Mot. for Compassionate Release*

---

[1] Mr. Newton previously filed a pro se motion for compassionate release on September 15, 2020. *Pro Se Mot. for Compassionate Release* (ECF No. 1020). There, he requested that the Court appoint counsel to file a supplemental brief on his behalf. *Id.* On September 17, 2020, the Court granted Mr. Newton's request, appointed counsel, and ordered his counsel to notify the Court whether Mr. Newton would file an amended petition or proceed on the initial petition. *Appointment of Counsel & Scheduling Order* (ECF No. 1024). On September 23, 2020, Mr. Newton notified the Court that he intended to file an amended petition and asked for an extension of time. *Mot. to Extend Deadline to Amend Pet. for Compassionate Release or to Notify Ct. that Case Will Proceed on Initial Filing* (ECF No. 1029). The Court granted that motion. *Order* (ECF No. 1034).

(ECF No. 1075); *Gov't's Second Suppl. Obj. to Def.'s Mot. for Compassionate Release* (ECF No. 1077); *Def.'s Suppl. Resp. in Supp. of Mot. to Reduce Sentence for Compassionate Release* (ECF No. 1078); *Order on Mot. for Compassionate Release* (ECF No. 1079) (*First Order on Compassionate Release*).

On May 9, 2023, once again invoking 18 U.S.C. § 3582(c)(1)(A), Mr. Newton moved the Court to reduce his sentence.  *Mot. for Reduction of Sentence* (ECF No. 1142) (*Def.'s Mot.*).  On June 6, 2023, the Government responded in opposition. *Gov't's Resp. in Opp'n to Mot. for Compassionate Release* (ECF No. 1146) (*Gov't's Opp'n*).  Mr. Newton replied on August 21, 2023.  *Reply to Resp. in Opp'n* (ECF No. 1157) (*Def.'s Reply*).

## II.    FACTUAL BACKGROUND

The Court now provides an abridged version of the conduct that led to Mr. Newton's conviction.[2]  Prior to his federal offense, Mr. Newton had several convictions in the state of New York for disorderly conduct, petit larceny, driving while intoxicated, harassment, multiple controlled substance offenses, and a firearms offense.  *Restricted U.S. Probation Filing as to Darrell Newton*. Attach 1, *2nd Revised Presentence Investigation Report* ¶¶ 28-37 (ECF No. 1026) (*PSR*).  At the time of sentencing, Mr. Newton was a Criminal History Category IV under the Guidelines.  *Id.* ¶ 38.  Some of these prior convictions merit a brief discussion.

---

[2]     The Court draws much of this factual background from Mr. Newton's 2nd Revised Presentence Investigation Report (PSR).  *See Restricted U.S. Probation Filing*, Attach. 3, *PSR* (ECF No. 1023).  The Court adopted the PSR in full and relied on it to sentence Mr. Newton.  *Statement of Reasons* at 1 (ECF No. 962).  At the sentencing hearing on October 1, 2019, Mr. Newton admitted that the contents of the PSR were true and accurate.  *Tr. of Proceedings*, *Sentencing Proceedings* at 5:18-6:18 (ECF No. 994) (*Sentencing Tr.*).  The Court recounted this abridged factual background in its prior order denying Mr. Newton's motion for compassionate release.  *See Order on Mot. for Compassionate Release* (ECF No. 1079).

In 1995, when sixteen, Mr. Newton stole a 12-gauge shotgun. *PSR* ¶ 29. He pleaded guilty to petit larceny and was adjudicated as a youth offender. *Id.* He violated his probation for this offense, failed to perform the required forty hours of community service, and did not complete the required drug and alcohol abuse evaluation. *Id.* He also effectively refused to cooperate with New York state probation, and future supervision was deemed futile. *Id.*

On April 9, 1998, Mr. Newton pleaded guilty to criminal possession of a weapon in the second degree. *PSR* ¶ 34. This plea followed a December 29, 1997 incident in which Mr. Newton was involved in a shootout at an apartment complex in Elmira, New York. *Id.* One bullet passed through the bedroom of a nine-year-old boy and two bullets glanced off the siding of a window to another child's bedroom. *Id.* Police identified Mr. Newton as involved with the shooting after locating him nearby fleeing on foot from a stolen vehicle. *Id.* Mr. Newton admitted to driving the stolen vehicle and owning the cocaine and cocaine base found next to the vehicle. *Id.* He led officers to an area nearby the apartment complex where they recovered a semi-automatic pistol he had purchased to shoot someone with whom he had quarreled earlier in the week. *Id.* Mr. Newton claimed that he had visited the apartment complex to pick up marijuana but started shooting after individuals rushed him. *Id.* On May 29, 1998, he was sentenced to an indefinite term of incarceration between five and ten years, subject to parole. *Id.* After Mr. Newton was first paroled in 2005, he served portions of this sentence in installments, concurrently with sentences for new offenses and parole violations. *Id.* Mr. Newton

was finally released from this conviction on November 7, 2014 when he reached the maximum expiration date of his sentence. *Id.* As the Court will discuss, Mr. Newton began his involvement with the drug trafficking organization (DTO) in this case in 2015, within two months of his release from the 1997 incident.

On October 30, 2006, Mr. Newton received a six-year concurrent sentence in New York state for several drug-related offenses. *PSR* ¶ 35. On June 16, 2006, law enforcement spotted Mr. Newton departing from a suspected drug-involved apartment. *Id.* Law enforcement in a marked vehicle attempted to pull Mr. Newton over after he failed to stop at a stop sign. *Id.* A high-speed chase followed, during which Mr. Newton swerved toward police vehicles trying to stop him. *Id.* He eventually stopped his car and fled on foot before police apprehended him and found 169 plastic bags of cocaine on his person. *Id.* Mr. Newton had first been paroled on August 26, 2005, *id.* ¶ 34, and this June 16, 2006 incident, therefore, occurred a mere ten months after Mr. Newton was paroled for his 1997 firearms offense. *Id.* ¶ 35.

Turning to Mr. Newton's federal offense: beginning in approximately 2015 Mr. Newton led a DTO based in the Rochester, New York area that conspired to possess with intent to distribute heroin, fentanyl, and crack cocaine throughout central Maine. *PSR* ¶ 5-6. Each week, members of the DTO would travel to New York and Massachusetts to pick up large quantities of heroin and crack cocaine. *Id.* ¶ 5. After picking up the drugs, the conspirators would transport them to Maine for

distribution through a network of "stash" and "trap" houses.[3]  *Id.*  At the height of the conspiracy, there were between twelve and fifteen trap houses throughout central Maine, where out-of-state members of the DTO, alongside local dealers they recruited, would deal drugs to Mainers.  *Id.*  The U.S. Probation Office (PO) conservatively estimated that the conspiracy earned $1,350,000.00 in gross drug proceeds during Mr. Newton's ninety-week involvement.  *PSR* ¶ 8.

Although Mr. Newton primarily stayed in Rochester, he oversaw the Maine operation, controlled the drug supply, and received the proceeds.  *Id.*  He also generally organized the operation and recruited many of his co-conspirators.  *Id.* ¶ 6.  Conservatively, the PO estimates that Mr. Newton is responsible for 15,427.12 kilograms of converted drug weight.  *Id.* ¶ 10.  During weekly re-supply trips from Maine to New York and Massachusetts, co-conspirators brought Mr. Newton between $15,000 and $20,000 of drug proceeds.  *Id.* ¶ 8.  Some of Mr. Newton's co-conspirators committed gun crimes in Maine, including two murders, although evidence directly linking Mr. Newton to those murders is inconclusive.  *Id.* ¶ 9.

Based on his criminal history and offense conduct, the Court determined Mr. Newton was at Criminal History Category IV and had a Total Offense Level of 39.  *Statement of Reasons* at 1.  The applicable sentencing guideline range was three-hundred-sixty-months to life imprisonment, five years of supervised release, and a fine between $50,000.00 and $1,000,000.00.  *Id.*  Because of Mr. Newton's exposure to acts of violence during his formative years, the Court varied downward

---

[3]      A "stash" house is where the DTO stored the drugs; a "trap" house is where it sold them.  *PSR* ¶ 5; *Sentencing Tr.* at 46:1-7.

considerably, sentencing him to two-hundred-and-forty months of incarceration, five years of supervised release, no fine, and a $100.00 special assessment. *Id.* at 3; *J.* at 2-7.

## III.   THE PARTIES' POSITIONS

### A.   Darrell Newton's Motion for Reduction in Sentence

Mr. Newton contends that there are extraordinary and compelling reasons warranting compassionate release under 18 U.S.C. § 3582(c)(1)(A). *Def.'s Mot.* at 2-17. First, Mr. Newton documents his adverse childhood experiences, asserting he "not only witnessed traumatic, violent acts but also suffered some." *Id.* at 2. Citing the PSR, Mr. Newton recounts his history of "'substance abuse,' 'life on the streets' at an 'early age,' a kind of 'dysfunctional adolescence,' a 'dysfunctional abusive father,' and a mother who openly admits that she couldn't provide the parental guidance he needed." *Id.* at 3 (quoting PSR at 34).[4] Mr. Newton specifically references drug use and violence in his home, as well as having "witnessed three different violent deaths." *Id.* Citing some caselaw discussing scientific research on the negative effects of adverse childhood experiences on brain development, Mr. Newton asserts he "understands that in his crucial-development period he was denied some of the requirements for healthy human development. He understands now, mostly, that all those unfortunate variables helped create a man he no longer wishes to be." *Id.* at 4-5.

---

[4]     The Court has quoted Mr. Newton's motion but is not clear where these quotations are in the PSR. Mr. Newton's pin citation "PSR at page 34" is not accurate. The PSR contains only 29 pages. Even though the Court could not locate these exact quotes, the gist of what Mr. Newton is claiming is borne out by the PSR generally.

Mr. Newton submits that there is a sentencing disparity in his case when considering "the lengths of his codefendants' sentences and the national averages of various offenses." *Id.* at 5. Specifically, "Newton's sentence is 186 months longer than the lowest sentence and 110 months longer than the second highest sentence [of his codefendants.]" *Id.* Mr. Newton then asserts the "national average sentence for drug trafficking in 2019 was 76 months . . . 164 months lower, 3.2 times, than [his] sentence," *id.*, and that his "sentence is four months shorter than the average for murder" despite him being "no kingpin" regardless of his leadership role. *Id.* at 7.

Mr. Newton turns to "harsh conditions of imprisonment." *Id.* at 8. Specifically, he points to the "31 months of lockdowns and restrictions never experienced before by prisoners" to assert that "COVID-19 has made Newton's sentence more punitive than the court realized at sentencing." *Id.* at 8-9. Mr. Newton narrows his focus, claiming prisoners at FCI Butner II, where he was previously held, "are suffering harsher than normal conditions" due to leaking roofs, black mold, despicable meals on dirty trays, and additional lockdowns due to prison shutdowns. *Id.* at 11-12. Therefore, Mr. Newton avers, "the harsher the conditions, the shorter the sentence should be." *Id.* at 12 (citing *United States v. Span*, 476 F.3d 476, 479 (7th Cir. 2007)).

Lastly, Mr. Newton turns to "miscellaneous circumstances" that he claims are "extraordinary and compelling." *Id.* at 13-17. These include only having two "minor infractions" during his current incarceration, his enrollment and completion

of mandatory and nonmandatory classes evidencing his rehabilitation, empirical evidence that incarcerative sentences may be longer than required for deterrence, and statistics that "disadvantaged segments of the population" such as Black, poorly educated, poor, and addicted individuals face more frequent and harsher sentences. Mr. Newton concludes that he "has grown older and wiser. He now sees the big picture. His perspectives on life today stand in contrast to the man he was before, even the man before this Honorable Court during sentencing." *Id.* at 13-16.

One of Mr. Newton's exhibits is a letter from him to the Court. *Id.*, Attach. E (*Letter from Newton*). In his letter, he states that in "drafting this letter, I am borrowing the mind of another inmate whose English, grammar, etc, is better than mine, but please make no mistake in thinking that the thoughts, feelings, and many words are not mine." *Id.* at 1. Mr. Newton goes on to say that he writes the Court "with the utmost sincerity and honesty" and that he has done "some soul searching, and what a waste of life I had been living out there . . . I held no regard for the feelings of others in my pursuit of self-gain, etc. I had no empathy." *Id.* Mr. Newton adds, "when I think back to some of my behavior, I am so relieved that my careless, reckless actions did not hurt anyone, especially those innocent children on 12/19/1997, when bullets from my gun entered their bedrooms. At nine years old I witnessed things that I'd never wish another child to endure, yet my actions have caused that nine-year-old boy to remember that incident for life." *Id.* at 2. Mr. Newton speaks of the "utmost disappointment" of his incarceration, but that he is "grateful that it happened," *id.* at 3, and understands "that the court truly had

mercy on me. . . I am so grateful for that, and I truly thank the Court. And I honestly have to think: if I would've received a slap on the wrist . . . would I have opened my eyes?" *Id.*

### B.     The Government's Opposition

The Government argues that "as with his first motion, Newton fails to demonstrate that extraordinary and compelling reasons warrant a sentence reduction" and that "Newton remains a danger to the community and the factors in 18 U.S.C. § 3582(c)(1)(A) weigh strongly against his release." *Gov't's Opp'n* at 1.

First, the Government contends that because "Newton's traumatic and violent childhood experiences were already considered by the Court at sentencing, they do not constitute an extraordinary and compelling reason for a sentence reduction." *Id.* at 7. Moreover, "where the circumstances are largely the same as when a defendant first entered BOP custody, or since the denial of a prior motion for compassionate release, the justification for seeking compassionate release is neither extraordinary or compelling, and thus not a basis for the Court to order compassionate release." *Id.*

Next, the Government challenges Newton's assertion that sentencing disparities exist between him and his codefendants because his "culpability was unmatched," "especially given his distinct involvement in the offense." *Id.* at 8. The Government then claims Newton's argument about the national average sentence for drug trafficking in 2019 "is misleading" because the average he cites "does not take into account the nature and circumstances of the offense or offense level,"

rendering the statistic "not particularly helpful here." *Id.* at 9.  Considering the offense level and relevant criminal history, the Government argues "defendants across the nation [in similar circumstances] received longer sentences than he did." *Id.*

With respect to Newton's allegations about harsh conditions at FCI Butner II, the Government argues that because "Newton was transferred to Philadelphia FDC, the circumstances at his former facility do not provide an extraordinary or compelling reason to reduce his sentence." *Id.* at 10.

The Government also disputes Newton's arguments about miscellaneous circumstances.  First, the Government asserts that "his arguments pertaining to his alleged rehabilitation fall short of what is required to establish an extraordinary and compelling reason to reduce his sentence." *Id.*  at 11.  Next, the Government argues "[t]he length 'of a lawfully imposed sentence does not create an extraordinary or compelling circumstance.'" *Id.* at 12 (quoting *United States v. Andrews*, 12 F.4th 255, 260-61 (3rd Cir. 2021)).  Addressing Mr. Newton's argument about racially disparate sentences, the Government claims he "makes no showing that his race was in any way factored into his sentence or that there is a systemic problem with disparate sentences based on race in this Court or on a national level." *Id.*

The Government concludes by pointing to this Court's previous analysis to argue Newton remains a danger to the community, *id.* at 12-13 (citing *First Order on Compassionate Release* at 20-24 and *Sentencing Tr.* at 38-59), and that "the

nature and circumstances of the offense, Newton's history and characteristics, public protection, adequate deterrence, and the need for the sentence to reflect the seriousness of the offense, promote respect for the law and provide just punishment, all warrant a denial of Newton's motion." *Id.* at 13.

### C. Darrell Newton's Reply

In his reply, Mr. Newton "strenuously disagrees with the Government." *Def.'s Reply* at 1. First, Mr. Newton concedes that the Court "did consider his childhood experiences" but maintains "that fact does not work to prevent the Court from consulting the [adverse childhood experiences] claims" in combination with other claims before the Court, especially because the Court failed to consider that Mr. Newton had not yet grown out of his childhood experiences. *Id.* at 2.

Next, Mr. Newton argues the Government's response to his disparity claims was "narrowed" and "the Government's silence [as to (2) disparities between him and convicted murderers; (3) disparities between him and convicted kidnappers; and (4) disparities between him and convicted robbers] should be construed as a concession" that they "constitute extraordinary and compelling reasons that weigh in favor of relief." *Id.* at 3.

Mr. Newton contends that the "Government attempts to isolate [his] harsh conditions claims to the confines of Butner II's[] food service department, when in fact he points to the restrictive operations throughout the BOP." *Id.* at 4. In Mr. Newton's view, the fact that he "is no longer a resident at Butner II, does not erase the fact that he experienced and suffered such harsh conditions at the facility." *Id.*

Therefore, he "seeks to have his term reduced by a pe[r]iod of time that would—based on the onerous conditions—still equate to him serving out his 240-month term." *Id.* at 5. Mr. Newton argues that time served during the pandemic should be considered the "equivalent of either time and a half or two times what would ordinarily be served," *id.* (citing *United States v. Valencia-Lopez*, No. 05-CR-841 (NGG), 2022 U.S. Dist. LEXIS 11461, at *2 (E.D.N.Y. Jan. 21, 2022)), and that the seven weeks he collectively spent held in United States Penitentiary-Allenwood's holdover unit and the Low Security Correctional Institute-Allenwood's special housing unit should be considered far longer for purposes of time served. *Id.* at 6-7.

Lastly, Mr. Newton takes issue with the Government's "significant rehabilitative efforts" language, arguing that is not the standard required by 18 U.S.C. § 3142(g). Instead, Mr. Newton pleads that the Court not focus on what he did, which cannot be undone, and instead look to how "he has changed as shown through his voluntary enrollment in educational courses and in his letter to the Court." *Id.* at 9. To support this claim, Mr. Newton contends 18 U.S.C. § 3582(c)(1)(A) requires the Court to "consider who he is now, and not just consider Mr. Newton at the time of his sentencing or even at the time of his previous motion for a reduction of sentence." *Id.*

## IV. LEGAL STANDARD

Before reducing a sentence, the Court must find that "extraordinary and compelling reasons warrant" the movant's sentence reduction after considering the factors set forth in 18 U.S.C. § 3553(a)—to the extent they are applicable. 18 U.S.C.

§ 3582(c)(1)(A)(i);  *accord United States v. Texeira-Nieves*, 23 F.4th 48, 52 (1st Cir. 2022) ("Next, the district court must consider any applicable 3553(a) factors and 'determine whether, in its discretion, the reduction … is warranted in whole or in part under the particular circumstances of the case'") (quoting *United States v. Saccocia*, 10 F.4th 1, 4 (1st Cir. 2021)).  18 U.S.C. § 3582(c)(1)(A) also requires any sentence reduction to be "consistent with applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A)(ii).[5]

The Court, then, must begin by considering the factors set forth in 18 U.S.C. § 3553(a).  These factors are: "(1) the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," "to afford adequate deterrence," "to protect the public from further crimes," and "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment"; (3) "the kinds of sentences available"; (4) "the kinds of sentencing and sentencing

---

[5]      In *United States v. Rivera-Rodríguez*, 75 F.4th 1 (1st Cir. 2023), the First Circuit noted that its caselaw had "clarified that, because (up until recently) the Commission had not issued any policy statements applicable to the prisoner-initiated motions for compassionate release, district courts 'ha[d] discretion, unconstrained by any policy statement currently in effect, to consider whether a prisoner's particular reasons are sufficiently extraordinary and compelling to warrant compassionate release.'" *Id.* at 18 n. 22.

In the time since, however, "the Sentencing Commission has promulgated new guidelines relevant for compassionate release motions, which we expect district courts to take heed of when determining whether an individual meets the statute's requirements for such relief." *Id.* (citing Amendments to the Sentencing Guidelines, U.S. Sentencing Commission (Apr. 27, 2023), https://www.ussc.gov/guidelines/amendments/adopted-amendments-effective-november-1-2023).

The Court takes heed of this change.  The Court notes the most recent amendment revises U.S. SENTENCING GUIDELINES MANUAL §1B1.13(a) to reflect that a defendant is now authorized to file a motion under 18 U.S.C. § 3582(c)(1)(A).  Given this amendment, the policy statement is now applicable to both defendant- and BOP-filed motions and consequently must be considered in this defendant-initiated motion.

range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines"; (5) "any pertinent policy statement"; (6) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"; and (7) "the need to provide restitution to any victims in the offense." 18 U.S.C. § 3553(a)(1)-(7).

After considering these 18 U.S.C. § 3553(a) factors, the Court turns to determining whether "extraordinary and compelling reasons" exist that warrant a sentence reduction. To aid in this determination, the United States Sentencing Commission policy statement provides six categories of reasons. U.S. SENTENCING GUIDELINES MANUAL § 1B1.13 (U.S. SENTENCING COMM'N 2023) (U.S.S.G). These categories are the defendant's 1) "medical circumstances", 2) "age", and 3) "family circumstances"; 4) whether the defendant was the "victim of abuse" while in custody; 5) "other reasons" similar in gravity as those articulated in (1)-(4); and 6) whether the defendant received an "unusually long sentence." *Id.* at § 1B1.13(b).

Beyond these categories, the policy statement speaks to the incarcerated individual's rehabilitation, and provides that "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement. However, rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances . . .." *Id.* at § 1B1.13(d). The policy statement also addresses foreseeability and clarifies that "an extraordinary and compelling reason need not

have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment.  Therefore, the fact that an extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court does not preclude consideration for a reduction." *Id.* at § 1B1.13(e).

Through all these considerations, the movant bears the burden of proving that he is entitled to a sentence reduction, and "the Court has broad discretion to grant or deny." *United States v. Curtis*, No. 1:14-cr-00140-JAW, 2020 U.S. Dist. LEXIS 102045, at *12 (D. Me. June 11, 2020) (quoting *United States v. Britton*, No. 18-cr-108-LM, 2020 U.S. Dist. LEXIS 83396, at *4 (D.N.H. May 12, 2020) (internal citations omitted)).

## V.   DISCUSSION

The nature of Mr. Newton's crime, his criminal history, the need for specific and general deterrence, and his original sentence being below the sentencing guideline all counsel against a sentence reduction.  The Court determines that no sentencing disparities exist, and that the Court appropriately considered Mr. Newton's adverse childhood experiences in imposing his sentence.  The Court concludes that neither Mr. Newton's allegedly harsh incarcerative conditions nor his rehabilitative efforts—separately or together—provides extraordinary and compelling reasons for a reduction in his sentence.

### A.   Exhaustion

18 U.S.C. § 3582(c)(1)(A) contains a mandatory claim processing rule, which bars some compassionate release motions as untimely.  *See United States v. Crosby*,

No. 1:17-cr-00123-JAW-01, 2020 U.S. Dist. LEXIS 199085, at *17 (D. Me. Oct. 27, 2020) (citing *United States v. Lugo*, No. 2:19-cr-00056-JAW, 2020 U.S. Dist. LEXIS 63673, 2020 WL 1821010, at *3 (D. Me. Apr. 10, 2020)).  However, that provision is not a jurisdictional bar, and the Government can waive the exhaustion requirement either expressly or by failing to raise it as a defense.  *See id.* (citing *United States v. Alam*, 960 F.3d 831, 833 (6th Cir. 2020)).

"Under the circumstances here, rather than argue that Newton is required to file a new request for a sentence reduction with the Warden at Philadelphia FDC in order to fulfill the exhaustion requirement, the Government declines to pursue any claims that Newton has not satisfied the exhaustion requirement in § 3582(c)(1)(A)."  *Gov't's Opp'n* at 5.

In light of the Government's position, the Court concludes the Government waived the exhaustion defense and decides Mr. Newton's compassionate release motion on its merits.[6]

### B.    18 U.S.C. § 3553(a) Factors

"[T]he district court must consider any *applicable* 3553(a) factors."  *Texeira-Nieves*, 23 F.4th at 52 (emphasis supplied).  The Court applied the 18 U.S.C. § 3553(a) factors when it sentenced Mr. Newton and expanded on their application in its March 15, 2021 order denying Mr. Newton's first request for compassionate release.  *See Sentencing Tr.* at 40:13-22; *First Order on Compassionate Release.*  The

---

[6]    In so ruling, the Court has not reached the merits of whether an inmate must renew compliance with the exhaustion requirement following a transfer between BOP facilities.

Court has reviewed its prior determinations and reaffirms them in full.  The Court, however, once again discusses the applicable factors as § 3582(c)(1)(A) requires.

### 1. First § 3553(a) factor

The first § 3553(a) factor requires that the Court consider "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).  The first part of this factor, the nature and circumstances of the offense, weighs heavily against a reduction of Mr. Newton's sentence.

Mr. Newton led a drug-trafficking organization that successfully conspired to possess with intent to distribute heroin, fentanyl, and crack cocaine throughout central Maine.  *PSR* ¶ 5.  Each week—at Mr. Newton's behest—members of the organization traveled to New York and Massachusetts to pick up large quantities of heroin and crack cocaine, *id.*, ultimately buying and distributing 15,427.12 kilograms of converted drug weight.  *Id.* ¶ 10.  After picking up the drugs, the conspirators transported them to Maine for distribution through a network of over a dozen "stash" and "trap" houses, where they would deal drugs to Mainers in conjunction with local street dealers.  *Id.*  This conspiracy, conservatively, earned $1,350,000.00 in gross drug proceeds during Mr. Newton's ninety-week reign.  *PSR* ¶ 8.  To maintain the lucrative scheme, some of Mr. Newton's co-conspirators committed gun crimes in Maine, including buying at least fifteen firearms resulting in two murders, although evidence directly linking Mr. Newton to those murders is inconclusive.  *Id.* ¶ 9.  Everything included, the conspiracy Mr. Newton led and

18

profited from caused and continues to cause untold harm and suffering to the people of central Maine.

The circumstances of his offense make Mr. Newton's actions and the possibility of his early release even more worrisome. Mr. Newton manufactured this lucrative heroin, fentanyl, and crack cocaine smuggling operation a mere two months after his release from state prison. *Sentencing Tr.* at 49:15-19. This fact is all the more troubling when one considers that Maine is more than five hundred miles away from Mr. Newton's home in the Rochester, New York area. *Id.* To account for this geographic reach, the Court reasoned that the contacts Mr. Newton developed during his prior stints in prison made it possible for him to organize this conspiracy and obtain a significant amount of heroin and crack cocaine in just two months. *Id.* at 49:19-50:4. Taking a broader look at the circumstances leading to Mr. Newton's crime is not encouraging; prior to his federal offense, Mr. Newton had several convictions in the state of New York for offenses including disorderly conduct, petit larceny, driving while intoxicated, and harassment, alongside controlled substance offenses and a firearms offense. *PSR* ¶¶ 28-37.

The first § 3553(a) factor also requires that the Court consider "the history and characteristics of the defendant." Even considering Mr. Newton's adverse childhood experiences, the Court finds Mr. Newton's lengthy criminal history, including committing crimes shortly after being released in the past, counsel against a sentence reduction at this time.

Mr. Newton's lengthy criminal history and age further weigh against his release.  Mr. Newton is in his mid-forties, with a criminal record beginning in his teenage years that spans decades.  The Court previously said that "[t]he need to protect the public [from Mr. Newton] is obvious." *Sentencing Tr.* at 49:15.  Before Mr. Newton began the conduct underlying this federal conviction, he had already served prison time for the 1997 firearms conviction.  *PSR* ¶ 34.  More recently, he served a six-year prison sentence in New York, which concluded in November 2014.  *Sentencing Tr.* at 49:15-19.  By January of 2015, a mere two months after his release from state prison, Mr. Newton was overseeing a drug smuggling operation in Maine that would lead to his federal conviction.  *Id.*  As such, the Court sees a palpable need for specific deterrence.  Mr. Newton's previous shorter prison terms did not deter his continuing criminal conduct.  The Court is unconvinced that his current less-than-seven-year incarceration has sufficiently deterred future misconduct give Mr. Newton's lengthy streak of opportunistic criminality.

Just a few years ago, Mr. Newton stood at the head of his own self-created multi-state drug-trafficking organization and demonstrated that he can organize and sustain large-scale criminal activity.  Moreover, as he did so almost immediately after his last release from incarceration, the Court is concerned that an early release would afford him an opportunity to endanger the public safety once again by supplying communities with deadly, illicit drugs.

Relevant here is that even as Mr. Newton attempts to demonstrate his growth and rehabilitation, he still attempts to shirk responsibility for running a

violent drug operation by denying he was its kingpin.  *Def.'s Mot.* at 7 ("Newton was no kingpin despite the leadership role, and the reality is that there is not one kingpin at Newton's facility, just offenders and drug abusers with lots of time"). Mr. Newton's protestations run contrary to the findings of the PSR and of this Court.  The PSR stated:

> **Darrell Newton** (a/k/a **Coast and D-Coast**) was the leader of the DTO.  **He** controlled the drug supply for the conspiracy, **he** received the drug proceeds, and **he** primarily stayed in Rochester, and relied upon Denton Worrell (a/k/a "Lil D") and Jamie Betances (a/k/a Booger, Booga, Buga, and Ice) to remain in Maine and manage the operation locally.

*PSR* ¶ 6 (emphasis in original).  Mr. Newton not only received a leadership role enhancement under U.S.S.G. § 3B1.1(a), but also a two-level increase for participating in a pattern of criminal conduct engaged in as a livelihood.  *Id.* ¶¶ 18, 20.  At the sentencing hearing, the Court stated:

> [T]he first difference I see in your client as opposed to literally anyone else I've ever sentenced is he was - - it's his conspiracy.  That's - - that's very different from anyone else.  I've never seen it, frankly.  I've seen a lot of people who became involved in conspiracies, but there was always someone further up the chain who was directing it, and this one seems to be - - you know, it really - - the buck stops right at your client. It was his idea, and he has the knowledge and intelligence and the managerial ability to carry it out, and he did.

*Sentencing Tr.* at 23:23-24:7.  The Court went on:

> [T]his is different in the sense that your client got out of jail and he said there's an opportunity here, and he knew the people - - he knew Denton Worrell, and he knew Jamie Betances, and he knew the people - - most of the people from Rochester that were sent here, and he was the one who sent them here, and they reported to him, and he was the one who got the drugs and knew what the shipments were and knew what the money was going to - - knew what money should be coming back.

21

*Id.* at 24:18-25:2.  At his sentencing hearing, Mr. Newton's counsel agreed with the Court's description of his role: "That's not an easy pill to swallow, but he has swallowed it." *Id.* at 25:9-10.

Mr. Newton's current contention that he is "no kingpin" despite his leadership role is contrary to his position at the sentencing hearing and contrary to the Court's understanding of the Newton conspiracy. *Def.'s Mot.* at 7.  Mr. Newton played a "central part in a system or complex arrangement."  Kingpin, OXFORD ENGLISH DICTIONARY, https://www.oed.com/dictionary/kingpin_n?tl=true.  Or one can say he was the "chief person in a group or undertaking."  Kingpin, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/kingpin.   Mr. Newton's attempt to rewrite history and walk back his role in his own drug trafficking conspiracy is fatal to his motion.

Mr. Newton stood at the top of a conspiracy of his own device, and the federal Government prosecuted fifteen individuals who worked either directly or indirectly for him, *see United States v. Darrell Newton, et al.*, 1:17-cr-00073, and it is apparent that the Government did not prosecute every individual who was involved in the Newton conspiracy.  *See id.*  According to the federal prosecutor, Mr. Newton was being held responsible for "nearly 34,000 ingestion events." *Sentencing Tr.* at 16-17. The PSR estimated that during the ninety weeks of the Newton conspiracy, his lieutenants sent as much as $1,350,000 from Maine to Mr. Newton in Rochester, New York. *PSR* ¶ 8.  Mr. Newton's denial of his role undermines his assertions of

growth and rehabilitation and gives the Court pause to reduce his already downward-varied sentence.

It may be that, in stating that he was no "kingpin," Mr. Newton was only attempting to point out that he was not the Pablo Escobar of drug distribution in the Northeast.  Mr. Newton's counsel made the point that he was not "rolling in money," *id.* at 27:2-5, and that "a lot of the money that was generated by these drugs obviously went back up the source chain to somebody else."  *Id.* at 27:9-12.  The Court agreed.  *Id.* at 27:18-24.

But for Mr. Newton to try to minimize his role or deflect his responsibility for his own conspiracy is inconsistent with the facts.  Mr. Newton got out of jail on November 7, 2014, and by January 2015, only about two months after his release from prison, he was dealing crack cocaine and heroin in Maine.  *Id.* at 45:17-21.  According to the Assistant United States Attorney, Mr. Newton became aware of "the opportunity to make money selling drugs in central Maine when he met a Mainer or two who happened to be visiting in upstate New York."  *Id.* at 8:24-9:2.  The federal prosecutor described Mr. Newton's "business plan," namely to send drugs he had bought in Rochester at low prices and sell them in Maine at higher prices, recruiting dealers from Rochester to oversee the Maine operation.  *Id.* at 9:3-8.  There was no question from the Court's perspective that this conspiracy was "Mr. Newton's conspiracy."  *Id.* at 17:14-16.

Of course, there is more to Mr. Newton's history.  One reason Mr. Newton offers to be "extraordinary and compelling" so as to warrant a sentence reduction

are his adverse childhood experiences. The Court extensively discussed Mr. Newton's difficult upbringing at his October 1, 2019 sentencing hearing. *Id.* at 41:2-45:25. Nevertheless, the Court addresses his adverse childhood experiences here because they are central to his pending motion and crucial to understanding the "history and characteristics of the defendant."

Mr. Newton concedes that the Court "did consider his childhood experiences" at sentencing but maintains "that fact does not work to prevent the Court from consulting" his adverse childhood experiences in combination with other claims before the Court, especially because the Court failed to consider that Mr. Newton had not yet grown out of his childhood experiences. *Def.'s Reply* at 2. The Court does not reiterate its extensive consideration of Mr. Newton's personal history and characteristics. *Sentencing Tr.* at 41:2-45-25. However, it does note that after considering Mr. Newton's adverse childhood experiences, the Court varied downward by 120 months from the guideline range during sentencing. *Statement of Reasons* at 3; *J.* at 2-7. With this downward variance in mind, the Government asserts that "where the circumstances are largely the same as when a defendant first entered BOP custody, or since the denial of a prior motion for compassionate release, the justification for seeking compassionate release is neither extraordinary or compelling, and thus not a basis for the Court to order compassionate release." *Gov't's Opp'n* at 7.

The Court agrees with Mr. Newton that his adverse childhood experiences may again be considered as the Court determines whether his motion for sentence

reduction is meritorious.  18 U.S.C. § 1B1.13(d); *id.* at § 3553(a) (outlining factors considered at sentencing); *see also United States v. Rivera-Rodriguez*, 75 F.4th 1, 19 (1st Cir. 2023) ("As long as the individualized circumstances, taken in the aggregate, satisfy the 'extraordinary and compelling' standard, granting relief would be consistent with Congress's judgment that a modification of a sentence legally imposed may be warranted when extraordinary and compelling reasons for taking that step exist") (quoting *United States v. Ruvalcalba*, 26 F.4th 14, 19 (1st Cir. 2022)).

The Court once more takes notice of the difficult and violent circumstances Mr. Newton faced in his upbringing, including witnessing and suffering "traumatic, violent acts"; his history of "substance abuse, life on the streets at an early age, a kind of dysfunctional adolescence, a dysfunctional abusive father, and a mother who openly admits that she couldn't provide the parental guidance he needed"; and his having "witnessed three different violent deaths." *Mot. for Reduction of Sentence* at 2-3.

Nonetheless, Mr. Newton is wrong to assert that the Court failed to account for the fact that "he had not yet grown out of his childhood experiences." *Def.'s Reply* at 2.  Quite to the contrary.  Mr. Newton's continued inability to grow out of the negative mindsets and patterns of behavior that led him to commit crimes that perpetuated the pain and suffering he experienced as a child featured prominently in the Court's original sentencing and its denial of his first motion for compassionate release.  The Court varied downward to account for the many harms

25

Mr. Newton faced that almost certainly influenced his life outcomes to date. However, the Court still imposed a 240-month sentence coupled with five years of supervised release to account for the extensive and egregious nature of the Newton conspiracy, the harm he caused in directing a multistate drug trafficking organization, and the lengthy time needed for specific deterrence of Mr. Newton, who needs to work through the damaging conditions of his upbringing and how they have manifested in his life to date.

The Court commends that "recently—along his path of seeking betterment" Mr. Newton has "come to understand the effect of his [adverse childhood experiences] on his personality" and that he "understands now, mostly, that all those unfortunate variables helped create a man he no longer wishes to be." *Mot. for Reduction of Sentence* at 5. However, that realization is not the end, but the beginning of a long journey of self-understanding and growth. After the downward variance granted at sentencing, for Mr. Newton's adverse childhood experiences to count as an extraordinary and compelling reason for another reduction will require far more of him. Given his growth to date, the Court remains hopeful Mr. Newton's remaining sentence gives him the opportunity to experience that development and maturation.

Altogether, then, the Court finds that the first § 3553(a) factor counsels in favor of not reducing Mr. Newton's sentence.

### 2.    Second § 3553(a) factor

The second § 3553(a) factor mandates the Court consider "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," "to afford adequate deterrence," "to protect the public from further crimes," and "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment."  18 U.S.C. § 3553(a)(2).

The Court sentenced Mr. Newton to 240 months of incarceration followed by five years of supervised release.  This sentence reflects the seriousness of Mr. Newton's offense, one that brought over 15,000 kilograms of converted drug weight and the use of over a dozen guns to central Maine.  Lowering Mr. Newton's sentence after he has served approximately a third of it, without any extraordinary and compelling reason, would give some drug traffickers the impression that similar conduct is not worthy of serious punishment, undermining adequate deterrence both for Mr. Newton and others considering committing crimes like his.  Consequently, it would also fail to protect the public from further crimes of this nature.  The Court also notes Mr. Newton has taken advantage of several educational training opportunities.  This bodes well for his chances of success on supervised release.  Maintaining Mr. Newton's sentence gives him sufficient time to continue his development and better prepare for a lawful life upon his release.

### 3.     Third and Fourth § 3553(a) factors

Next, the Court turns to the third § 3553 factor, "the kinds of sentences available," and the fourth factor, "the kinds of sentencing and sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines."  18 U.S.C. § 3553(a)(3)-(4).

Considering Mr. Newton's base offense (possession with intent to distribute controlled substances), firearm possession, aggravating and leadership roles, and acceptance of responsibility for the offense, the Court found Mr. Newton had a total offense level of 39 and a criminal history category of IV.  *Sentencing Tr.* At 39.

Given this offense level and criminal history, the sentences available in this case were: 1) imprisonment, with a statutory minimum of 120 months and a guideline range of 360 months to life, 2) supervised release, with a guideline term of five years, 3) a fine of $50,000 to $10 million dollars, and 4) a mandatory special assessment of $100.  *Id.* at 39-40.  Of note, Mr. Newton was not eligible for probation under these calculations.  *Id.* at 40.

After considering the sentences available, the Court ultimately sentenced Mr. Newton to 240 months of imprisonment, five years of supervised release, no fine, and a $100 special assessment; the Court stands by this decision.  The Court complied with the statutory minimum sentence for Mr. Newton's crime and varied downward from the guideline range after accounting for Mr. Newton's difficult childhood.  The Court's supervised release term complied with the guideline term.  The Court chose to not fine Mr. Newton, despite the guideline range, to help him

better support his family upon his release.  Lastly, the Court complied with the mandatory $100 special assessment and lack of probation.

Taken together, given the Court complied with non-discretionary sentences and exercised its discretion at sentencing well within appropriate bounds, the third and fourth § 3553(a) factors counsel against reducing Mr. Newton's already-lowered sentence.

### 4.   Fifth § 3553(a) factor

As named in the legal standard section, the Court's review of Mr. Newton's motion is viewed in conformance with § 1B1.13, the Sentencing Commission's policy statement on 18 U.S.C. § 3582(c)(1)(A) motions for reduction in sentence.[7]

### 5.   Sixth § 3553(a) factor

The Court next turns to the sixth § 3553(a) factor, "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).

Mr. Newton submits that there is a sentencing disparity in his case when considering "the lengths of his codefendants' sentences and the national averages of various offenses."  *Mot. for Sentence Reduction* at 5.  The Government challenges Mr. Newton's assertion because his "culpability was unmatched," "especially given his distinct involvement in the offense."  *Gov't's Opp'n* at 8.  The Government also claims Mr. Newton's argument about the national average sentence for drug

---

[7]     The Court also reviewed the Amendment to the First Step Act and its policy statement. None of the substantive amendments applies to Mr. Newton's case. Similarly, the amended policy statement, § 4A1.3, is not relevant, as it only applies to downward departures in limited circumstances where a defendant meets multiple criteria, including not being a leader in the offense.

trafficking in 2019 "is misleading" because the average he cites "does not take into account the nature and circumstances of the offense or offense level," rendering the statistic "not particularly helpful here." *Id.* at 9.  In his reply, Mr. Newton argues the Government's response to his disparity claims was "narrowed" and that "the Government's silence [as to (2) disparities between him and convicted murderers; (3) disparities between him and convicted kidnappers; and (4) disparities between him and convicted robbers] should be construed as a concession." *Def.'s Reply* at 3.

While there is a difference between Mr. Newton's sentence and those of his codefendants, there is no unfair discrepancy or inconsistency.  "Newton's sentence *is* 186 months longer than the lowest sentence and 110 months longer than the second highest sentence [of his codefendants.]"  *Mot. for Reduction of Sentence* at 5 (emphasis supplied).  There is a clear reason for that difference; the Government is correct that Mr. Newton's "culpability was unmatched," "especially given his distinct involvement in the offense." *Gov't Opp'n* at 8.

As discussed at length above in the Court's analysis of the first § 3553(a) factor, *see supra* at 20-23, Mr. Newton was the chief architect of an enormous and sophisticated interstate fentanyl, heroin, and crack cocaine distribution conspiracy, the corresponding additional months to his sentence are justified. *See Sentencing Tr.* at 48:16-69:6.  Mr. Newton's unique role in this conspiracy is a material difference that supports a weightier sentence. *See United States v. Sepulveda*, 34 F.4th 71, 76 (1st Cir. 2022) ("The district court also reasonably rejected [the defendant's] claims that his sentence was disproportionate compared to his own co-

defendants based on *material differences* that justified the diverging sentences")
(emphasis supplied).

There is also no sentencing discrepancy between Mr. Newton and similarly-
situated defendants. 18 U.S.C. § 3553(a) makes clear that courts "shall consider . . .
the kinds of sentencing and [the] sentencing range established for the *applicable
category of offense* committed by the *applicable category of defendant* as set forth in
the guidelines." 18 U.S.C. § 3553(a)(4) (emphasis supplied). In other words, the
statutory language makes clear that courts shall focus on the sentencing range that
is applicable for the offense committed by the precise category of defendant. The
Government was thus correct to focus its response on the alleged disparity between
Mr. Newton and other defendants of the same criminal history and offense category.
Comparisons across crimes are not particularly helpful as they also fall outside the
statutory scheme that requires courts to look at similarly situated defendants. *See
id.* Therefore, the Court only focuses on comparing Mr. Newton with other
individuals sentenced for drug-trafficking offenses.

Mr. Newton is correct that the "national average sentence for drug trafficking
in 2019 was 76 months . . . 164 months lower, 3.2 times, than Newton's sentence."
*Def.'s Mot.* at 7. However, this statistic is misleading because it "does not take into
account the nature and circumstances of the offense or offense level" as required by
§ 3553(a). *Gov't's Opp'n* at 9.

Instead, it is more helpful to look at defendants similarly situated to Mr.
Newton. At sentencing Mr. Newton had an offense level of 39 and a criminal

31

history category of IV for his heroin and cocaine base offense.  "[U]sing . . . the same offense level of 39 and [criminal history category] of III (one category below the defendant's), the average length of imprisonment was 267 months in prison, with a median length of 276 months."  *Gov't's Opp'n* at 9 (citing Judiciary Sentencing Information (JSIN), U.S.S.C., https://jsin.ussc.gov/analytics/saw.dll?Dashboard). Additionally, with an "offense level of 28 (one below the defendant's) and a [criminal history category] of IV, the average sentence was 296 months and the median was 319 months."  *Id.* (emphasis in original).  In other words, looking at sentences of similarly situated defendants, Mr. Newton's 240-month sentence is considerably shorter, militating against a sentence reduction.

### 6.  Seventh § 3553(a) factor

The Court does not address "the need to provide restitution to any victims in the offense" because that factor is not applicable here.

### C.  Extraordinary and Compelling Reasons

After considering the § 3553(a) factors, to grant Mr. Newton's motion under 18 U.S.C. § 3582(c)(1)(A)(i), the Court must find that "extraordinary and compelling reasons" warrant a sentence reduction.

To aid courts in this determination, the United States Sentencing Commission policy statement offers six categories for a sentence reduction:  the defendant's 1) "medical circumstances", 2) "age", and 3) "family circumstances"; 4) if the defendant was the "victim of abuse" while in custody; 5) "other reasons" similar

in gravity as those articulated in (1)-(4); and 6) if the defendant received an "unusually long sentence." § 1B1.13(b).

Mr. Newton claims that his extraordinary and compelling reasons are (1) his adverse childhood experiences, (2) sentencing disparities, (3) harsh conditions of imprisonment, and (4) "miscellaneous factors," including courses completed while incarcerated, overall harsh federal sentences, and a general racial disparity in federal sentencing. *Mot. for Reduction of Sentence* at 1-17. The Government disagrees that these are extraordinary and compelling reasons. *Gov't's Opp'n* at 6-12.

As the Court has already considered Mr. Newton's claims regarding his adverse childhood experiences and sentencing disparities while discussing the § 3553(a) factors above, it does not repeat that analysis here. Instead, the Court focuses on Mr. Newton's latter two claims: harsh conditions of imprisonment and "miscellaneous factors." As these claims do not fall within categories 1-4 of the USSG policy statement, and as Mr. Newton's sentence is not unusually long as required by category 6, the Court considers Mr. Newton's "other reasons" and seeks to determine if they are "similar in gravity as those articulated in (1)-(4)," § 1B1.13(b)(5).

The Court ultimately finds there are no extraordinary and compelling reasons warranting a sentence reduction.

### 1.    Alleged Harsh Conditions of Imprisonment

Mr. Newton's argument on harsh conditions of imprisonment focuses on two main components.  First, Mr. Newton points to "31 months of lockdowns and restrictions never experienced before by prisoners."  *Def.'s Mot.* at 8-9.  Second, he asserts that prisoners at FCI Butner II, where he was previously held, "are suffering harsher than normal conditions" due to leaking roofs, black mold, despicable meals on dirty trays, and additional lockdowns due to shutdowns throughout the prison.  *Id.* at 11-12.  The Government argues that because "Newton was transferred to Philadelphia FDC, the circumstances at his former facility do not provide an extraordinary or compelling reason to reduce his sentence," rendering the point "moot."  *Gov't's Opp'n.* at 10.  Mr. Newton maintains that the fact he "is no longer a resident at Butner II, does not erase the fact that he experienced and suffered such harsh conditions at the facility."  *Def.'s Reply* at 4.  Therefore, Mr. Newton "seeks to have his term reduced by a pe[r]iod of time that would—based on the onerous conditions—still equate to him serving out his 240-month term."  *Id.* at 5.

If Mr. Newton were seeking equitable relief for the past conditions at Butner II, the issue would be moot as the Government argues; in that case, there would not be a live case or controversy nor any meaningful relief the Court could provide.  *See Ford v. Bender*, 768 F.3d 15 (1st Cir. 2014).  However, Mr. Newton raises the issue of the Butner II conditions as a factor to be considered in a separate controversy that remains live—whether his sentence should be reduced.  Consequently, the issue of his prison conditions is not moot here.

That said, a prisoner seeking relief must show that his conditions of confinement are extraordinarily atypical.  *See United States v. Turner*, 569 F.3d 637, 642 (7th Cir. 2009) (stating that the inmate's claims would have to rise to the "truly egregious" level to be considered for sentencing relief); *United States v. Ramirez-Gutierrez*, 503 F.3d 643, 646 (7th Cir. 2007) (rejecting a conditions of confinement downward departure where the inmate was unable to obtain care for his broken tooth, lived in poorly ventilated quarters, and was given an inadequate opportunity to exercise during a two and one-half month incarceration); *United States v. Dyck*, 334 F.3d 736, 743 (8th Cir. 2003) (finding that to obtain a downward departure based on conditions of confinement, a defendant would have to demonstrate the conditions were "so substandard or onerous as to take this case out of the heartland of cases").

While district courts have considered the more severe conditions prisoners faced during the COVID-19 lockdowns when considering compassionate release, that consideration does not apply to Mr. Newton because he has not demonstrated that he experienced conditions amounting to extraordinary circumstances not faced by prisoners throughout the country.  In his reply, Mr. Newton concedes as much. *See Def.'s Reply* at 4 ("Government attempts to isolate Mr. Newton's conditions claims to the confines of Butner II's[] food service department, when in fact he points to the restrictive operations throughout the BOP").

Absent an extraordinary circumstance, district courts do not have discretion to modify a sentence based on conditions of confinement.  *Cf. United States v. White*,

91 F. App'x 162, 163 (1st Cir. 2004) ("It is settled law that under 18 U.S.C. § 3585(b), discretion to credit time served is vested in the Attorney General, through the Bureau of Prisons . . . and not in the sentencing court"). The Court acknowledges the difficulty of the sentence served by Mr. Newton caused by the global pandemic, which the Court did not, of course, foresee. But prison is never a pleasant place, and while the pandemic unfortunately made it even more unpleasant for prisoners throughout the country, the difficulties Mr. Newton faced were consistent with pandemic-related struggles both within our prison system and beyond. They certainly are not "similar in gravity," § 1B1.13(b)(5), to suffering from a terminal illness, or a serious condition that limits one's ability to provide self-care.[8] *See* § 1B1.13(b)(1). Nor are they similar in gravity to sexual or physical abuse "committed by or at the direction of a correction office, an employee or contractor of the Bureau of Prisons, or any other individual who had custody or control over the defendant." *See* § 1B1.13(b)(4).

Therefore, they are not an extraordinary and compelling factor for reducing Mr. Newton's sentence.

### 2. **Miscellaneous Factors**

#### a. **Courses Completed**

---

[8] Section 1B1.13(b)(1)(D) contemplates a defendant being "housed a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public healthy emergency declared by the appropriate federal, state, or local authority." However, for a sentence reduction to apply, the defendant would have to also show that due to their personal health risk factors they were "at increased risk of suffering severe medical complications or death" and that "such risk cannot be adequately mitigated in a timely manner." Mr. Newton does not make these additional showings here, therefore the Court cannot grant his requested relief on these grounds.

36

Mr. Newton submits that his rehabilitation and education efforts constitute an extraordinary and compelling reason for a sentence reduction.  The Court disagrees.  Generally, "rehabilitation alone shall not be considered an extraordinary and compelling reason."  *United States v. Canales-Ramos*, 19 F.4th 561, 566 (internal marks omitted); *see also United States v. Buli*, No. 2:16-cr-00174-JDL-2, 2020 U.S. Dist. LEXIS 196562, at *2 (D. Me. Oct. 22, 2020) (stating that "newfound respect for the law" is alone insufficient to warrant release).  The USSG policy statement clarifies that nonetheless, "rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances." § 1B1.13(d).

Mr. Newton points to only having two "minor infractions" and his enrollment and completion of several mandatory and nonmandatory classes as evidence of his rehabilitation.  The Court commends Mr. Newton's attempts and apparent successes at using his time in prison to improve himself and find a way to become a productive member of society upon his release.  These efforts without more, however, are insufficient to warrant a sentence reduction.

### b.   Harsh Sentences and Racial Disparities in Sentencing

Next, Mr. Newton argues that federal sentences, particularly for drug offenders, are too long and cites empirical evidence suggesting that the deterrent effects of these long prison sentences do not justify their social and economic costs. This is certainly an important policy question but one that falls outside this Court's ambit.

37

Before the Court is whether Mr. Newton's sentence should be reduced. Mr. Newton's sentence is not onerously long. To the contrary. The Government is correct that the length "of a lawfully imposed sentence does not create an extraordinary or compelling circumstance." *United States v. Andrews*, 12 F.4th 255, 260-61 (3rd Cir. 2021). Moreover, Mr. Newton received a sentence 120 months *below* the statutory guidelines for his offense given his criminal history score. Consequently, whether federal sentences are generally harsh, the lawful imposition and substantial downward departure of Mr. Newton's sentence precludes his argument that his sentence is one that is so harsh that its length alone is an extraordinary and compelling reason to reduce it.

Mr. Newton also argues that there is a racial disparity in sentencing. The Government contends that "Newton makes no showing that his race was in any way factored into his sentence or that there is a systemic problem with disparate sentences based on race in this Court or on a national level." *Gov'ts Opp'n* at 12. Credible studies show a racial disparity in federal criminal sentencing nationally. *See, e.g.*, Chad M. Topaz, et al., *Federal Criminal Sentencing: Race-Based Disparate Impact and Differential Treatment in Judicial Districts*, 10 HUMAN. & SOC. SCI. COMMS. 366 (2023), https://doi.org/10.1057/s41599-023-01879-5. However, Mr. Newton does not point to any such sentencing disparity in this Court. Nor does he point to race having factored into his sentence whatsoever. Therefore, national sentencing disparities without any alleged relationship to Mr. Newton's sentence are not a compelling or extraordinary reason for reducing his sentence.

Taken together, considering all four categories of "extraordinary and compelling reasons" provided by Mr. Newton, the Court concludes that Mr. Newton's circumstances fall short of presenting extraordinary and compelling reasons for his release.

## VI.   CONCLUSION

The Court DISMISSES Darrell Newton's Motion for a Reduction of Sentence (ECF No. 1142) without prejudice.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 8th day of December, 2023.